DARRYL WAYNE SCHILLING,

        Plaintiff,

    v.

GARY LOREDO, et al.,

        Defendants.

Case No. 17-cv-04054-YGR (PR)

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY
JUDGMENT AND ADDRESSING
PLAINTIFF'S PENDING MOTIONS**

## I. INTRODUCTION

Plaintiff Darryl Wayne Schilling, a state prisoner incarcerated at San Quentin State Prison ("SQSP"), filed a *pro se* civil rights action pursuant to 42 U.S.C. § 1983, seeking damages for the alleged violation of his constitutional rights by individuals who are employees of the California Prison Industry Authority ("CALPIA"), operating under the auspices of the California Department of Corrections and Rehabilitation ("CDCR"). Specifically, Plaintiff claims that Defendants, who work at SQSP's furniture factory, were deliberately indifferent to his health and safety by knowingly exposing him to asbestos or rebuffing his concerns regarding asbestos exposure. Plaintiff also alleges that he was released from his assigned job at the furniture factory in retaliation for complaining about his asbestos exposure.

On January 23, 2018, the Court ordered service of the following cognizable claims: (1) an Eighth Amendment claim for deliberate indifference against CALPIA Plant Manager Gary Loredo as well as CALPIA Supervisors Ron Glass and Luu Rogers; and (2) a retaliation claim against CALPIA Supervisors Glass and Tomique McClure.

The parties are presently before the Court on Defendants' Motion for Summary Judgment. Dkt. 27. Plaintiff has filed an opposition to Defendants' motion, and Defendants have filed a reply. Dkts. 30, 32. Plaintiff has filed an unsolicited sur-reply as well as a motion for leave to file a sur-reply, which Defendants oppose. Dkts. 36, 37.

Also before the Court is Plaintiff's motion entitled, "Motion for Recusal Against the Deputy Attorney General Kyle A. Lewis, State Bar Number #201041," which Defendants oppose.

Dkts. 31, 35.  Plaintiff has also filed a reply to Defendants' opposition.  Dkt. 38.

Having read and considered the papers submitted and being fully informed, the Court hereby DENIES Plaintiff's motion for leave to file a sur-reply, DENIES his motion for recusal, and GRANTS Defendants' motion for summary judgment.

## II.    FACTUAL BACKGROUND

### A.    The Parties

At the time of the events set forth in his complaint, Plaintiff was an inmate at SQSP.  Dkt. 1 at 1.[1]  Plaintiff started working at the furniture factory for CALPIA at SQSP in May 2015, at a rate of $ 0.30/hour.  Glass Decl. ¶ 2.  In February 2016, Plaintiff was working as a Furniture Upholsterer, and his pay was raised to $ 0.50/hour.  McClure Decl. ¶ 2.  On August 18, 2016, Plaintiff was moved to porter duties, and his pay rate remained at $ 0.50/hour.  McClure Decl. ¶ 4.

Meanwhile, all Defendants are current or former civilian employees at SQSP's CALPIA facilities.  Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 3.  In 2015, Defendant Loredo was the Lead Manager of CALPIA operations.  Loredo Decl. ¶ 2.  In May 2015, Defendant Glass was Plaintiff's supervisor and was CALPIA's Industrial Supervisor of Upholstery and Acting Superintendent II of Wood Products at SQSP.  Glass Decl. ¶ 2.  In February 2016, Defendant McClure took over as Supervisor over inmate-workers in the wood products section.  McClure Decl. ¶ 2.  In 2015-2016, Defendant Rogers was Superintendent of Maintenance Repair at SQSP, and he was also "the Designated Safety Coordinator for CALPIA operations, responsible for maintaining workplace safety."  Rogers Decl. ¶ 2.

### B.    Plaintiff's Version

Plaintiff claims that while he was working in the furniture factory on May 2, 2015, Defendant Glass directed him to clean certain areas of the facility.  Dkt. 1 at 8.  Plaintiff claims that while he was cleaning he came into contact with "a large amount of a white substance which every time it came into contact with a broom would crumble into a cloud of fine powdery dust surrounding [and] engulfing Plaintiff which [he] was forced to continuously breath without benefit

---

[1] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by the parties.

of any safety protection or respiratory equipment." *Id.* Plaintiff claims that he "was informed that the white substance was asbestos material." *Id.* As a result, Plaintiff asserts that he has suffered health problems, including respiratory issues which could "possibly be caused by exposure to friable asbestos." *Id.* at 9.

On April 5, 2016, Plaintiff served Defendant Glass with a Worker's Compensation Claim, *Id.* Plaintiff claims that Defendant Glass "became angry claiming that there was no documentation to support such a claim." *Id.*

On April 12, 2016, Plaintiff filed a 602 inmate appeal for "personal injury" relating to the aforementioned incident. *Id.* at 10. On July 27, 2016, CALPIA Administrator Paul Miller interviewed Plaintiff and "granted in part" the 602 appeal, stating "there would be no retaliation against the Plaintiff for raising his complaint concerning asbestos in the facility." *Id.* Plaintiff claims that he pursued this appeal to the highest level of appeal that was available to him. *Id.* at 2.

Plaintiff alleges that on August 18, 2016, Defendants Glass and McClure met with him and served him with "a CDCR Form 101 (work supervisor's report) which reflected grades not representing [his] true work ethics and history." *Id.* at 10. Plaintiff adds that the report also "recommended a demotion of Plaintiff without just cause." *Id.*

On September 20, 2016, Plaintiff claims that "at the request of Supervisor Defendant McClure" "Sergeant [J.] Lewis [a non-party] authored a memorandum requesting Plaintiff be removed from his assigned job (of seventeen months) using [a] 'Limited Duty' medical chrono even though the limitations listed did not correspond correctly with any real medical limitations preventing the Plaintiff from working at the job he was assigned." Dkt. 1 at 10. Plaintiff states that the chrono was "not implemented based on [his] physician's actual diagnosis and work limitation request." *Id.* at 11.

Plaintiff claims that the "removal of Plaintiff from his assigned job . . . was as a direct response by defendants to [his] reasonable complaints concerning asbestos contamination . . . [and that] [t]his removal was in direct contradiction to defendant's assertions that there would be no retaliation against Plaintiff for filing those complaints." *Id.*

3

C.    **Defendants' Version**

1.    **May 2015 Incident**

Although Defendant Glass claims that he cannot recall specifically telling Plaintiff to clean CALPIA's furniture factory second floor mezzanine storage area in May 2015, Defendant Glass concedes that it would not have been uncommon for him to tell an inmate to do that sometime during the month.  Glass Decl. ¶ 4.  According to Defendant Glass, "[w]ood chips and other general debris accumulate on the floor in this area, as well as sawdust from furniture production in the building, and cotton fibers from the adjacent mattress factory.  *Id.*  Defendants Glass and Rogers regularly walked around the furniture factory for safety checks and to ensure that work was being done.  Glass Decl. ¶ 5; Rogers Decl. ¶ 2.

It is generally known that some of the steam pipes running along the ceiling and walls in CALPIA's furniture factory are wrapped in asbestos insulating material, and that the pipes are marked "Asbestos."  Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 3.  It is widely known that so long as asbestos-containing materials are not friable, or in such a state that they can be easily broken into small fragments or reduced to powder, these materials are unlikely to release measurable levels of asbestos fibers into an airborne environment if they are left undisturbed.  Loredo Decl. ¶ 3; Rogers Decl. ¶ 3.  Workplace safety is very important at CALPIA, and if personnel became aware of possible friable asbestos material in the furniture factory, they would have immediately taken appropriate actions for the health and safety of all persons.  Loredo Decl. ¶¶ 4, 5; Glass Decl. ¶ 6; Rogers Decl. ¶¶ 2, 5.  Defendants Loredo, Glass, and Rogers claim that they were not aware of the presence of any friable asbestos or disturbed asbestos pipe coverings in the furniture factory.  Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 3.

2.    **Response to Alleged Exposure to Asbestos-Containing Materials**

As explained above, Plaintiff alleged that while sweeping the upstairs area of the furniture factory on May 2, 2015, he came across a white substance on the floor that resembled pieces of sheetrock about the size of a dime to a golf ball that would crumble when swept by the broom.  K. Lewis Decl., Ex. E at 86:9-87:4.  Plaintiff alleged that he swept up asbestos containing material that was on the ground.  *Id.* at 71:13-72:7.  Plaintiff believed that the material he was sweeping

was asbestos because pipes running overhead were marked "Asbestos," and another inmate named Monty Taylor showed Plaintiff the pipes where the material was coming from. *Id.* at 72: 8-19; 134: 9-12. However, Defendants contend that no custody staff ever told Plaintiff that the material on the ground was asbestos. *Id.* at 73:2-25. Inmate Taylor did not go upstairs to see Plaintiff sweeping or cleaning the furniture factory storage area. *Id.* at 89: 20-25; 90:25-92:1. Inmate Taylor did not tell Plaintiff that the material Plaintiff was cleaning up was asbestos. *Id.* at 94:1-8. None of the pieces of material lying on the floor had the word "Asbestos" on them. *Id.* at 95: 10-13. Plaintiff believed that the material on the floor was asbestos by looking at the pipes and seeing missing chunks. *Id.* at 99:4-10. Defendants point out that no scientist identified the material on the ground as asbestos, and Inmate Taylor does not have a specialized degree to be able to identify asbestos-containing materials. *Id.* at 99:11-19. Plaintiff alleged that he also encountered cotton or fiberglass-looking material that he believed was asbestos by looking up at the overheard pipes. *Id.* at 145: 2-11. At his deposition, Plaintiff admitted that it is possible some of this white cotton-like material could have come from the production of chairs or other furniture. *Id.* at 144:9-20. Plaintiff also stated that Defendant Glass did not specifically direct Plaintiff to clean up a white powdery substance on the floor. *Id.* at 102:21-23. Plaintiff stated that he does not believe that Defendant Loredo knew that Plaintiff was cleaning asbestos-containing materials upstairs in the furniture factory. *Id.* at 131:5-20.

### 3.    Plaintiff's Physician's Findings Related to Asbestos Exposure

In January 2016, Plaintiff reported possible asbestos exposure to his SQSP primary care physician, Dr. George Beatty, and requested a work-up for asbestosis.[2] Beatty Decl. ¶ 5. Dr. Beatty found it unlikely that Plaintiff's symptoms were related to an asbestos exposure this recent, and felt that if Plaintiff was exposed, the duration was so short that it likely would not result in long-term health effects. *Id.* Plaintiff had a significant history of tobacco use, which could be causing some mild chronic obstructive pulmonary disease that he was encountering. *Id.* Based on

---

[2] Asbestosis is a lung disease that develops when asbestos fibers cause scarring in a person's lungs, thus restricting breathing and interfering with oxygen's ability to enter the bloodstream. Beatty Decl. ¶ 5.

Plaintiff's tobacco history, along with a strong family history of cancer, Dr. Beatty decided that a low-dose computed tomography ("LDCT") scan could be helpful in assessing his condition. *Id.* Plaintiff's February 2016 LDCT scan results were within normal limits, except for a 4 mm. subpleural nodule in the lower left lobe of his lungs. *Id.* ¶ 6. Subpleural nodules are sometimes present in patients with a significant tobacco history, such as Plaintiff, and nothing suggested that the nodule was related to asbestos exposure or asbestosis. *Id.* Plaintiff also suffered from chronic pain syndrome, which stemmed from a lower back injury that he suffered many years ago. *Id.* ¶ 7.

Even though the lung nodule that had been seen in Plaintiff's February 2016 LDCT scan was of quite questionable significance given the minimal and recent claim of alleged asbestos exposure, Dr. Beatty decided to obtain another CT scan to assess any change. Beatty Decl. ¶ 9. No suspicious pulmonary nodule was found in Plaintiff's follow-up CT scan taken in October 2016. *Id.* ¶ 10. Plaintiff presently suffers from chronic nerve pain, and he continues to receive care for neuropathy and associated pain to his upper neck, lower back, buttocks, and legs, which is exacerbated when bending or twisting. *Id.* at ¶ 11. Plaintiff has no present complaints or symptoms attributable to alleged asbestos exposure or asbestosis. *Id.*

### 4. Plaintiff's Work Supervisor's Reports

Defendant Glass issued Plaintiff a Form CDC 101, Work Supervisor's Report, on June 1, 2015, that graded Plaintiff's work as a Furniture Assembler as "Satisfactory" in all areas and increased Plaintiff's pay rate to $ 0.40/hour. Glass Decl. ¶ 7. Work Supervisor Reports are the supervisor's evaluation of the inmate-worker's performance during a certain period, and reflect the supervisor's opinions, not those of other CALPIA staff, correctional staff, or the inmate's coworkers. *Id.* In May 2016, Defendant McClure gave Plaintiff a CDC Form 101 Work Supervisor's Report that wholly rated his Furniture Upholsterer performance as "Satisfactory" and raised his pay from $ 0.40/hour to $ 0.50/hour. McClure Decl. ¶ 2. After this, Defendant McClure noted that Plaintiff's performance started deteriorating. *Id.* Defendant McClure spoke with Plaintiff about his performance, but it did not improve. *Id.*

Sometime in 2016, Plaintiff requested forms to file a worker's compensation claim concerning a work-related injury at CALPIA. Glass Decl. ¶ 8. Defendant Glass claims that he did

not retaliate against Plaintiff for filing a worker's compensation claim. *Id.* Defendant McClure was generally aware that Plaintiff had filed some type of worker's compensation claim, but he was not aware that Plaintiff had filed inmate administrative appeals about his injuries or alleged working conditions at the furniture factory. McClure Decl. ¶ 3.

### 5. Plaintiff's August 18, 2016 Work Supervisor's Report and His New Porter Position

On or about August 18, 2016, Defendant McClure authored a Work Supervisor's Report that gave Plaintiff lower performance grades in five categories and noted Plaintiff's lack of interest in his current upholstery position and that he was being moved to porter duties. McClure Decl. ¶ 4. Defendant McClure claims that Plaintiff's move to a porter position was not a demotion, and Plaintiff's pay rate remained at $ 0.50/hour. *Id.*

Because Defendant McClure was giving Plaintiff a negative report, Defendant McClure discussed it with Defendant Glass, but Defendant Glass did not write or edit Defendant McClure's report. *Id.* Plaintiff admitted that he was not demoted from one position to another at CALPIA, and explained that he was moved to a position with the same pay that was considered less glamorous or desirable among inmates. K. Lewis Decl., Ex. E at 109:18-112:12.

While working as a porter, Plaintiff swept, mopped, and hosed down toilets, which caused him to bend over and stoop, at times. *Id.* at 190:4-191:4. On September 2, 2016, Dr. Beatty issued him a permanent limited duty Medical Classification Chrono, Form CDCR-Form 128-C3, for his back-pain condition. Beatty Decl. ¶ 8; K. Lewis Decl., Ex. E at 183:7-15; K. Lewis Decl., Ex. C at DEF 010. Plaintiff's permanent limited duty chrono restricted his physical activities to no lifting or carrying more than nineteen pounds, no standing for a prolonged period, and no stooping, bending, or climbing. Beatty Decl. ¶ 8; J. Lewis Decl. ¶ 4; K. Lewis Decl., Ex. C at DEF 010.

### 6. Plaintiff's Permanent Limited Duty Chrono

Sometime in September 2016, Plaintiff gave Sergeant Lewis, who was working at SQSP's CALPIA, the permanent limited duty medical chrono authored by Dr. Beatty. J. Lewis Decl. ¶ 4. Sergeant Lewis took Plaintiff's medical chrono to Defendants McClure and Glass and stated that

Plaintiff's assigned position might not be the appropriate job assignment. J. Lewis Decl. ¶ 5; Glass Decl. ¶ 12; McClure Decl. ¶ 6. On September 20, 2016, Sergeant Lewis drafted a Form CDC-128-B Assignment Change General Chrono regarding the need to reassign Plaintiff to a position that follows the limited duty chrono criteria. *Id.*; K. Lewis Decl., Ex. C at DEF 009.

Thereafter, Plaintiff's Correctional Counselor I, Ms. J. Garcia, received Sergeant Lewis's Form CDC-128-B Assignment Change General Chrono in which Sergeant Lewis discussed Plaintiff's permanent limited duty medical chrono and its "limitations" with CALPIA staff, and how she "believed that [Plaintiff] needed to be reassigned to a different position." Dkt. 35-1, Garcia Decl. ¶ 3. On September 27, 2016, Correctional Counselor Garcia drafted a Classification Committee Chrono requesting a hearing date of October 5, 2016 because Plaintiff was being referred to the Unit Classification Committee ("UCC") for "request for Assignment change due to updated medical restrictions." *Id.* ¶ 4, Ex. A. According to Correctional Counselor Garcia, "after [she] prepared this chrono, it was voided because [Plaintiff] was unassigned from his position on 9/28/16 by San Quentin's Inmate Assignments Office according to [the CDCR's electronic Strategic Offender Management System] and the committee hearing was never held. *Id.*

The record shows that on September 28, 2016, Plaintiff was unassigned from his CALPIA assignment due to "medical restrictions." *Id.* ¶ 4; *see also* Dkt. 30-20 at 2.

### D. Information Relating to Asbestos Exposure, Hazards, and Regulations

According to several government authorities, "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed to the fibers." 20 U.S.C. § 3601(a)(3) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980); *id.* § 4011(a)(3) (Congressional statement of findings and purpose for the Asbestos School Hazard Abatement Act of 1984). "[E]xposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incidence of cancer and other severe or fatal diseases, such as asbestosis." 20 U.S.C. § 3601(a)(1) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980). Although making these findings about the general hazard of asbestos, Congress did not

choose to close all potentially affected schools and instead directed that a task force be established, that states prepare plans, and that financial and other assistance be provided to states to address the problem. *See* 20 U.S.C. § 3601(b).

The Occupational Safety and Health Administration ("OSHA") has regulations that do allow some asbestos exposure for workers. One regulation sets a "permissible exposure limit" for employee exposure to asbestos. *See* 29 C.F.R. § 1910.1001(c)(1) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 0.1 fiber per cubic centimeter of air as an eight (8)-hour time-weighted average"); *id.* § 1910.1001(c)(2) ("The employer shall ensure that no employee is exposed to an airborne concentration of asbestos in excess of 1.0 fiber per cubic centimeter of air (1 f/cc) as averaged over a sampling period of thirty (30) minutes").

## III. PLAINTIFF'S PENDING MOTIONS

### A. Motion for Leave to File a Sur-reply

Plaintiff has filed a motion for leave to file a sur-reply, in which he seeks to submit new evidence concerning an asbestos exposure incident that occurred at SQSP's CALPIA furniture factory in December 2015—more than six months after the incident of his alleged encounter with asbestos materials. Dkt. 36. Defendants argue that the Court should deny Plaintiff leave to do so because his filing is procedurally improper. Dkt. 37. The Court agrees with Defendants as the Local Rules do not permit the filing of a response to a reply. *See* Civ. L.R. 7-3(d). Moreover, there is no evidence that the December 2015 asbestos exposure incident is related to Plaintiff's May 2, 2015 alleged encounter with asbestos-containing materials. As such, Plaintiff has not shown, nor is there any indication in the record, that a sur-reply is either necessary or appropriate.

Accordingly, Plaintiff's motion for leave to file a sur-reply is DENIED. Dkt. 36.

### B. Motion for Recusal

Plaintiff also moves to recuse Defendants' counsel, Deputy Attorney General Kyle A. Lewis, on the grounds that counsel engaged in "acts of dishonesty and professional misconduct when he fabricated stories [concerning] previous investigations at [SQSP CALPIA facilities]." Dkt. 31 at 2. While not entirely clear, it seems that Plaintiff argues that Defendants' counsel knew

1    of a harmful asbestos condition at SQSO's CALPIA facilities, but did nothing to correct it, thus

2    causing harm to Plaintiff.  *Id.*  In support of this allegation, Plaintiff includes photographs that

3    were taken in connection with a separate lawsuit concerning SQSP's CALPIA mattress factory in

4    November 2015.  *Id.* at 1-2, 4-8; *see also* Dkt. 32-1, Loredo Decl. ¶ 2-3.)  Plaintiff further alleges

5    that Defendants' counsel represented Defendant Loredo in a prior action filed August 2, 2013

6    stemming from an asbestos exposure incident on June 6, 2012, and "willfully and knowingly

7    introduced evidence in the course of a prior proceeding that did make fair judgment impossible."

8    Dkt. 31 at 1-3.  Furthermore, Plaintiff also alleged in his opposition that Defendants' counsel

9    "took steps to commit fraud on this Court by knowingly submitting false and misleading

10   evidence" in support of Defendants' motion for summary judgment. Dkt. 30 at 2.  Specifically,

11   Plaintiff claims that counsel submitted false documents with Defendants' motion for summary

12   judgment concerning his "Classification Committee Chrono" dated September 27, 2016.  *Id.* at 2-

13   3.

14          In response to the alleged "acts of dishonesty and professional misconduct," Defendants'

15   counsel points out that the photographs submitted by Plaintiff were taken in connection with a

16   separate lawsuit concerning SQSP's CALPIA *mattress factory in June 2012*. *See* Dkt. 32-1,

17   Loredo Decl. ¶¶ 2-3.  Defendants argues that "[b]ecause these photographs appear to be from a

18   different facility than the CALPIA furniture factory where [Plaintiff] worked, and do not concern

19   his claims, it is unclear how Defendants have either misled the Court or caused [Plaintiff] harm."

20   Dkt. 35 at 2 (citing Dkt. 32-1, Loredo Decl. ¶ 2.)  Again, Plaintiff's claims in the instant lawsuit

21   arise from an alleged asbestos exposure incident in SQSO's CALPIA *furniture factory in May

22   2015.  See* Dkt. 1. The Court agrees with Defendants and DENIES the motion for recusal on this

23   ground.  *See United States v. $ 292,888.04* in U.S. Currency, 54 F.3d 564, 566-67 (9th Cir. 1995)

24   (conclusory allegations of bias and prejudice insufficient to support motion for recusal).

25          Furthermore, Defendants also deny that their counsel submitted a "false" or "misleading"

26   classification or UCC chrono concerning Plaintiff in support of their motion for summary

27   judgment.  Dkt. 35 at 3.  As mentioned, Plaintiff specifically takes issue with the Classification

28   Committee Chrono drafted by Correctional Counselor Garcia on September 27, 2016.  Dkt. 30 at

3. Defendants deny that they acted to mislead the Court, stating as follows:

> . . . Correctional Counselor Garcia prepared the Unit Classification Committee (UCC) chrono that Defendants cited in their motion for summary judgment. (Decl. J. Garcia Re: Schilling Chrono, ¶ 3; *see* Decl. K. Lewis Supp. Defs.' Mot. Summ J., Ex C., ECF No. 27-10 at 15.) Counselor Garcia prepared this UCC chrono after learning about a separate medical limitation chrono that was issued to [Plaintiff] by his physician. (*Id.*) The UCC chrono prepared by Counselor Garcia was for a committee meeting to unassign [Plaintiff] from his CALPIA job due to medical limitations. (*Id.*) But the committee [meeting] was never held and the chrono was voided because [Plaintiff] was removed from his job by the Inmate Assignments Office on September 28, 2016. (*Id.* at ¶ 4.) Despite being voided, the UCC chrono remains in the [CDCR]'s computerized inmate file database and could be reviewed, but it would not be apparent that it was voided unless other classification history screens were reviewed. (*Id.*) According to Counselor Garcia, [Plaintiff] received no adverse action as a result of this chrono. (*Id.*)

Dkt. 35 at 3. As explained above, the record shows that on September 28, 2016, Plaintiff was unassigned from his CALPIA assignment due to "medical restrictions." *Id.* ¶ 4; *see also* Dkt. 30-20 at 2. The Court finds no merit to Plaintiff's argument that Defendants' counsel provided the Court with any "false" or "misleading" documents. As such, Plaintiff's motion for recusal is DENIED. Dkt. 31.

## IV.    LEGAL STANDARD

Summary judgment is proper where the pleadings, discovery and affidavits demonstrate that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.*

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the moving party will have the burden of proof on an issue at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue for which the opposing party by contrast will have the burden of proof at trial, as is the case here, the moving

11

party need only point out "that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The court is only concerned with disputes over material facts and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. It is not the task of the court to scour the record in search of a genuine issue of triable fact. *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). The nonmoving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Id*. If the nonmoving party fails to make this showing, "the moving party is entitled to a judgment as a matter of law." *Celotex*, 477 U.S. at 323.

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Submitted by Defendants in support of the motion for summary judgment are Plaintiff's deposition and all attached exhibits (Dkt. 27-10, K. Lewis Decl., Exs. A-E) as well as declarations from the following: Defendants Loredo (two declarations), Glass, McClure, and Rogers (Dkts. 27-3, 27-4, 27-5, 27-6, 32-1); Sergeant Lewis ("J. Lewis") (Dkt. 27-7); Dr. Beatty (Dkt. 27-8); and Deputy Attorney General Kyle A. Lewis ("K. Lewis") (Dkt. 27-9). Meanwhile, Plaintiff has filed his verified complaint (Dkt. 1), his verified opposition to Defendants' motion and his declaration (Dkts. 30, 30-1), as well as various exhibits filed in support of his opposition (Dkts. 30-3 to 30-22). The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995). Defendants have filed objections to Plaintiff's evidence in support of his opposition. Dkt. 32 at 6-7. Defendants assert some of Plaintiff's exhibits either: (1) lack a foundation of personal knowledge or expertise; (2) contain hearsay; (3) have not been authenticated; and (4) are irrelevant and outside the scope of this action. Although the Court may discuss some of Plaintiff's evidence in question in its analysis, the Court also points out within its analysis why this evidence is not sufficient to defeat summary judgment.

The Court concludes that even if any of Plaintiff's aforementioned evidence was admitted and accepted at face value, Defendants still would be entitled to judgment as a matter of law, as set forth below. Accordingly, Defendants' objections to Plaintiff's evidence are DENIED as moot.

## V.    DISCUSSION

### A.    Eighth Amendment Claim

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994). Deliberate indifference to an inmate's health or safety may violate the Eighth Amendment's proscription against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A prison official violates the Eighth Amendment only when two requirements are met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's health or safety. *See Farmer*, 511 U.S. at 834.

### 1.    Objective Prong

Exposure to toxic substances may be a sufficiently serious condition to establish the first prong of an Eighth Amendment claim, depending on the circumstances of such exposure, as explained by the Supreme Court in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate stated Eighth Amendment claim based upon possible future harm to health, as well as present harm, arising out of exposure to second-hand smoke). The plaintiff "must show that he himself is being exposed to unreasonably high levels" of the toxic substance. *Helling*, 509 U.S. at 35. Moreover, determining whether the condition violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36.

Although *Helling* was a second-hand smoke case, the rule also applies to asbestos exposure. In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit cited *Helling* in a

case in which an inmate had been exposed to asbestos during a prison cleaning operation. The facts were much stronger for the plaintiff in *Wallis* than in Plaintiff's case, as the *Wallis* plaintiff extensively handled asbestos-containing materials when he was on a work detail required to clean an attic with damaged asbestos-containing insulation on pipes and insulation material that "had broken loose and lay scattered around the attic" with other debris. *Id.* at 1075. Wearing inadequate masks, the inmates were required to "tear off loose pipe covering and insulation" and bag it for disposal in a dusty attic without outside ventilation. *Id.* The court in *Wallis* spent little time discussing whether the objective prong was satisfied for the Eighth Amendment claim because it was "uncontroverted that asbestos poses a serious risk to human health," and the plaintiff's medical expert had declared that the amount of exposure for that plaintiff was "medically serious," *id.* at 1076.

Other circuits also have cited *Helling* in cases involving toxic substances such as asbestos. *See, e.g., Templeton v. Anderson*, 607 F. App'x 784, 787 (10th Cir. 2015) (summary judgment proper for defendant because requiring inmate to work for one hour removing asbestos mastic and tiles "was not a significant duration given the type of exposure at issue" and therefore did not satisfy the objective prong of Eighth Amendment claim); *Smith v. Howell*, 570 F. App'x 762, 765 (10th Cir. 2014) (affirming summary judgment on qualified immunity grounds on Eighth Amendment claim because there were no Tenth Circuit or Supreme Court cases by 2003 that had held "that a limited exposure to asbestos dust for a few hours poses such an objectively serious risk of future harm to offend contemporary standards of decency. Indeed there is no such authority even today."); *Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (there would be genuine issues of fact whether plaintiff was exposed to levels of asbestos sufficient to pose an unreasonable risk of damage to his future health based on his two-month stay in a facility "contaminated with asbestos to which inmates were routinely exposed," but summary judgment was proper because he alleged no physical injury and, pursuant to 42 U.S.C. § 1997e(e), he could not recover damages for mental and emotional stress without physical injury); *McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) (Eighth Amendment claim properly dismissed because being housed in a cell for ten months near asbestos-covered pipes was not a serious enough condition; plaintiff

"does not allege facts sufficient to establish that he was exposed to unreasonably high levels of asbestos. Had, for example, [plaintiff] been forced to stay in a dormitory where friable asbestos filled the air, . . .we might agree that he states a claim under the Eighth Amendment. . . . That, however, is not this case. . . . [T]he fact remains that asbestos abounds in many public buildings. Exposure to moderate levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards, be considered cruel and unusual.")

Here, the Court finds that Plaintiff fails to show a triable issue on the objective prong of his Eighth Amendment claim. Based on the evidence in the record, no reasonable jury could find that Plaintiff was "exposed to unreasonably high levels" of a toxic substance. *Helling*, 509 U.S. at 35. Plaintiff has presented evidence that for two weeks in May 2015 he was assigned to sweep the storage area of the furniture factory and came into contact with "a large amount of a white substance" that he believed was asbestos. However, nothing in the record confirms that the white substance was friable asbestos or shows that there existed any disturbed asbestos pipe coverings in the furniture factory. In contrast to *Wallis*, Plaintiff fails to provide any evidence that he was exposed to unreasonably high levels of a toxic substance. Indeed, Plaintiff admitted in his deposition that it was that possible some of this white cotton-like material could have come from the production of chairs or other furniture. *See* K. Lewis Decl., Ex. E at 144:9-20. Thus, no evidence exists to show that the while substance he was sweeping contained any asbestos, much less a dangerous amount of asbestos.

Assuming arguendo that Plaintiff had provided evidence that he was exposed to asbestos-containing materials, it appears that Plaintiff is merely relying on a presumption that *any* exposure to asbestos is so grave that it violates the Eighth Amendment. However, the Court finds that such a generalized presumption does not satisfy the standard set out in *Helling*. Plaintiff fails to present evidence that would allow the Court or a jury to do "a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure" to asbestos, as contemplated by *Helling*, 509 U.S. at 36. Without such evidence, a reasonable trier of fact would not be able to determine whether the risk that Plaintiff complains of is "so grave that it violates contemporary standards of decency to expose *anyone*

unwillingly to such a risk." *Id.*  As mentioned above, although there are Congressional findings that "medical science has not established any minimum level of exposure to asbestos fibers which is considered to be safe," 20 U.S.C. § 3601(a)(3), those findings did not result in Congress deeming it necessary to shut down all schools because of the possibility of asbestos exposure. Instead, Congress provided time for studying, planning, and funding efforts for asbestos remediation in schools.  Similarly, OSHA regulations set limits on asbestos exposure and allow some small exposure to workers.  These regulations contradict Plaintiff's general assertion that any exposure to asbestos would meet the high standard for an Eighth Amendment violation.

In addition to failing to show exposure to any measurable level of asbestos, Plaintiff also fails to establish a genuine issue for trial that he has suffered any current injury or has a likelihood of future injury as a result of his participation in the furniture factory clean-up.  No medical expert declared that the amount of alleged asbestos exposure for Plaintiff (if any) was "medically serious," unlike in *Wallis*, 70 F.3d at 1076.  Plaintiff's assertion to the contrary cannot sustain his claim.  He has no medical training and offers nothing but speculation that his current ailments are causally related to the alleged asbestos exposure, and that is not enough to defeat the motion for summary judgment.  *See, e.g.*, *Mejia v. McCann*, 2010 WL 5149273, *9-*10 (N.D. Ill. Dec. 10, 2010) (summary judgment granted for defendants on Eighth Amendment claim based on the regional problem of radium in the water because plaintiff did not show it caused plaintiff any harm, and his allegations that he suffered dry scalp and hair loss that he did not have before incarceration was not sufficient to send the matter to trial).  Plaintiff also fails to show any probability of future harm from the alleged asbestos exposure.  In contrast, Defendants present evidence of Plaintiff's long history of tobacco use and his documented history of other respiratory problems—some of which were caused by inhaling non-asbestos irritants—demonstrate that his alleged injuries, if they exist, are not attributable to asbestos exposure at the furniture factory.  K. Lewis Decl., Ex. D at DEF 015, 017, 019, 027.  Furthermore, Defendants present evidence that Plaintiff's pulmonary nodule that was discovered on an initial LDCT scan did not appear on a subsequent CT scan taken on October 2016, thus further discounting his alleged exposure to asbestos-containing materials.  Beatty Decl. ¶ 10.  Defendants also present an undisputed

declaration from Dr. Beatty, who stated that February 2016 LDCT scan results were within normal limits, except for subpleural nodules which are sometimes present in patients with a significant tobacco history, such as Plaintiff. *Id.* at ¶ 6. Furthermore, Dr. Beatty concluded that nothing suggested that the nodule was related to asbestos exposure or asbestosis. *Id.* Specifically, Dr. Beatty found it was "unlikely that [Plaintiff's] symptoms were related to an asbestos exposure this recent, and felt that if [Plaintiff] was exposed, the duration was so short that it likely would not result in long-term health effects." *Id.* ¶ 5. Finally, as of September 25, 2018, the date of his declaration, Dr. Beatty points out that Plaintiff "has no present complaints or symptoms attributable to alleged asbestos exposure or asbestosis." *Id.* ¶ 11. The Court notes that Plaintiff fails to provide competent evidence to the contrary.

Viewing the evidence and inferences therefrom in the light most favorable to Plaintiff, no reasonable jury could find that he was exposed to an unacceptably high level of asbestos (if any). And Plaintiff's self-diagnosis that his current ailments are causally related to asbestos exposure is insufficient to create a triable issue that the alleged asbestos exposure posed a sufficiently serious condition for the objective prong of an Eighth Amendment claim. Therefore, Plaintiff's claim fails on the objective prong.

### 2. Subjective Prong

As mentioned, the plaintiff must show that prison officials acted with deliberate indifference to the risk to his health or safety to establish the second prong of an Eighth Amendment claim. Under the deliberate indifference standard, the prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but "must also draw the inference." *Farmer*, 511 U.S. at 837. The prisoner "need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.* (citation omitted).

Here, the Court finds that Defendants prevail on the subjective prong (as well as the objective prong as explained above) of the Eighth Amendment claim with regard to the alleged asbestos exposure. Plaintiff has presented evidence that would allow a reasonable trier of fact to determine that Defendants Loredo, Glass, and Rogers were aware that there were pipe coverings presumed to contain asbestos in the furniture factory. Specifically, in their declaration, these Defendants concede that it was "generally known that some of the steam pipes running along the ceiling and walls in CALPIA's furniture factory are wrapped in asbestos insulating material, and that the pipes are marked 'Asbestos.'" Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 3. However, these Defendants also state that it was "widely known" that "so long as asbestos-containing materials are not friable, or in such a state that they can be easily broken into small fragments or reduced to powder, these materials are unlikely to release measurable levels of asbestos fibers into an airborne environment if they are left undisturbed." Loredo Decl. ¶ 3; Rogers Decl. ¶ 3. No evidence exists to show that these Defendants were aware of the presence of any friable asbestos or disturbed asbestos pipe coverings in the furniture factory. *See* Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 3. Defendants claim that "if personnel became aware of possible friable asbestos material in the furniture factory, they would have immediately taken appropriate actions for the health and safety of all persons." Loredo Decl. ¶¶ 4, 5; Glass Decl. ¶ 6; Rogers Decl. ¶¶ 2, 5. Defendants further argue as follows:

> That Defendants were not aware of the potential risk of exposure to friable asbestos is further demonstrated by their regular presence in the furniture factory while doing their CALPIA work. In so doing, these Defendants exposed themselves to the same asbestos conditions in the furniture factory alleged by [Plaintiff].

Dkt. 27 at 16 (citing Loredo Decl. ¶ 3; Glass Decl. ¶ 5; Rogers Decl. ¶ 2). Moreover, Plaintiff admitted in his deposition that Defendant Glass did not specifically tell him to clean up the white powdery substance on the floor. K. Lewis Decl., Ex. E at 102:21-23. And nothing in the record exists showing that either Defendants Loredo, Glass, or Rogers observed Plaintiff sweeping the white powdery substance, and could not have known what exactly he was cleaning up. *See id.* at 131:5-20; *see also* Glass Decl. ¶ 5; Rogers Decl. ¶ 4. Finally, Defendants Loredo, Glass, and Rogers claim they had no knowledge of the presence of friable asbestos in the furniture factory in

18

May 2015.  Loredo Decl. ¶ 4; Glass Decl. ¶ 5; Rogers Decl. ¶ 3.  And, as explained above, Plaintiff fails to present evidence showing that the white powdery substance was actually friable asbestos.  In light of the absence of evidence that Defendants Loredo, Glass, and Rogers knew of any possible risk of exposure to friable asbestos at the furniture factory in May 2015, no reasonable jury could conclude that these Defendants acted with deliberate indifference to a serious risk to Plaintiff's health by allowing him to sweep up the white powdery substance during that time frame. Therefore, Plaintiff does not show a triable issue on the subjective prong as to any Defendant.

In sum, viewing the evidence and reasonable inferences therefrom in the light most favorable to Plaintiff, Defendants Loredo, Glass, and Rogers are entitled to judgment in their favor on his Eighth Amendment claim based on his alleged exposure to asbestos.

## B.   Retaliation

Plaintiff claims that his First Amendment rights were violated when Defendants Glass and McClure released him from his assigned job at the furniture factory in retaliation for complaining about his asbestos exposure.  Defendants Glass and McClure argue they are entitled to summary judgment on Plaintiff's claim of retaliation "on the grounds that there are no triable issues of fact concerning their alleged adverse actions or the legitimate penological goals behind those actions." Dkt. 27 at 7.  Specifically, Defendants argue as follows:

> Contrary to [Plaintiff's] assertions that Defendants retaliated against him for complaining about the alleged asbestos exposure, [his] performance reports accurately reflected his supervisor's independent impressions, it is undisputed that his pay remained the same and he was not demoted, and CALPIA and San Quentin prison staff unassigned him for his porter position in the face of a permanent limited duty chrono issued by his physician that severely limited his ability to perform his required duties.

*Id.*  Thus, Defendants Glass and McClure claim that neither of them retaliated against Plaintiff for his worker's compensation claims or complaints about asbestos conditions by giving him inaccurate performance reports, demoting him, reducing his pay, or having him unassigned from his CALPIA work.  Glass Decl. ¶ 13; McClure Decl. ¶ 7.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic

elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). The prisoner need not prove a total chilling of his First Amendment rights; "that his First Amendment rights were chilled, though not necessarily silenced, is enough." *Id.* at 569.

As to the first and second elements, Plaintiff claims that Defendants Glass and McClure took the following adverse actions against him because he served Defendant Glass with a Worker's Compensation Claim on April 5, 2016 and filed a 602 inmate appeal for "personal injury" relating to the aforementioned incident regarding the alleged asbestos exposure: (1) gave Plaintiff inaccurate performance reviews on August 18, 2016; (2) demoted him to a different position at the furniture factory; and (3) ultimately had him unassigned from his CALPIA position in September 2016. Dkt. 1 at 9-11. In contrast, Defendants argue that Defendant McClure's actions were not adverse to Plaintiff, stating as follows:

> Foremost, despite [Plaintiff]'s assertion that Defendants retaliated against him beginning in April 2016, Defendant McClure gave [Plaintiff] a CDC Form 101 Work Supervisor's Report that wholly rated his Furniture Upholsterer performance as "Satisfactory" and raised his pay from $.40/hour to $.50/ hour on May 1, 2016. ([McClure Decl. ¶ 2].) It is undisputed that these actions were not adverse to [Plaintiff].

> Sometime after this, Defendant McClure noted that [Plaintiff]'s work performance started deteriorating. [Defendant] McClure spoke with [Plaintiff] about his performance, but it did not improve. (Decl. McClure Supp. Mot. Summ. J. (Decl. McClure) ¶ 2; [McClure Decl. ¶ 2].) On or about August 18, 2016, Defendant McClure authored a Work Supervisor's Report that gave [Plaintiff] lower performance grades in five categories, and noted his lack of interest in his current upholstery position and that he was being moved to porter duties. ([McClure Decl. ¶ 4].) [Plaintiff] claims that this report contained inaccuracies, but it reflected his supervisor's impressions of performance, not what other persons said. Work Supervisor Reports are the supervisor's evaluation of an inmate-worker's performance during a certain period, and reflect the supervisor's opinions, not those of other CALPIA staff, correctional staff, or the inmate's coworkers. ([Glass Decl. ¶ 7].) Moreover, the report did not decrease [Plaintiff]'s pay rate, so there was no tangible adverse action that flowed from it. ([McClure Decl. ¶ 4].)

Dkt. 27 at 18. For the aforementioned reasons, Defendants argue that "it is undisputed that the

Form CDC 101 Work Supervisor's Reports issued to [Plaintiff] by Defendants do not form the basis for a retaliation claim." *Id.* Defendants also argue that "it is undisputed that [Plaintiff] was not demoted in his CALPIA assignments when he moved from Furniture Assembler, to Furniture Upholsterer, to Porter." *Id.* at 18. Rather, Defendants point out that Plaintiff "was moved to positions that were admittedly less 'glamorous' or 'desirable' among the inmate population." *Id.* at 18 (citing K. Lewis Decl., Ex. E at 109:18-112:12). Moreover, Defendants add that "even with this move to a porter position, [Plaintiff]'s pay rate remained $.50/hour." *Id.* at 19 (citing McClure Decl. ¶ 4). Thus, Defendants argue that "[i]nmate-workers cannot claim retaliation against prison officials simply because they were moved to a job that they do not like." *Id.* at 18-19.

Nevertheless, Plaintiff points out that he was eventually "removed from his assigned job (of seventeen months)," and released from his CALPIA position, which "was a direct response by Defendants to Plaintiff's reasonable complaints concerning asbestos contamination." Dkt. 1 at 10-11. The Court finds that such action could be sufficient to constitute adverse action. *See e.g., Vignolo v. Miller*, 120 F.3d 1075, 1078 (9th Cir. 1997) (holding discharge from prison job in retaliation for exercise of constitutional right constitutes adverse action despite absence of constitutional right to prison job). Plaintiff further asserts that "this removal was in direct contradiction to [Defendants'] assertions that there would be no retaliation against Plaintiff for filing those complaints." Dkt. 1 at 11. Retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions, as well as direct evidence. *See Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). In the instant matter, Plaintiff has shown that his September 2016 removal from his CALPIA position occurred approximately five months after he filed his April 12, 2016 Worker's Compensation Claim, and less than three months after his 602 appeal was "granted in part." Dkt. 1 at 10.

As to the third of the above-referenced five elements, Plaintiff has submitted evidence sufficient to show the asserted retaliation was because of protected conduct, specifically, his filing of a Worker's Compensation Claim against Defendant Glass and a 602 inmate appeal for "personal injury" relating to the aforementioned incident regarding the alleged asbestos exposure.

Prisoners may not be retaliated against for exercising their "First Amendment right to pursue civil rights litigation in the courts." *See Schroeder v. McDonald*, 55 F.3d 454, 461 (9th Cir. 1995). The right of access to the courts extends to established prison grievance procedures. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004).

With respect to the fourth element, although Plaintiff must show his First Amendment rights were "chilled," a prisoner need not show a total chilling of his First Amendment rights in order to establish a retaliation claim. *See Rhodes*, 408 F.3d at 568-69 (rejecting argument that inmate failed to state retaliation claim where, after alleged adverse action, plaintiff nonetheless had been able to file inmate grievances and lawsuit). Here, Plaintiff has alleged he was removed from his assigned CALPIA position. Such action is sufficient to chill Plaintiff's First Amendment Rights, irrespective of whether Plaintiff was actually inhibited. *See id.* at 569.

Lastly, for his retaliation claim to survive, Plaintiff must also prove the fifth element, i.e., that there was no legitimate penological reason supporting Plaintiff's removal from his CALPIA position. *See Rhodes*, 408 F.3d at 567-68. Defendants argue that "based on the evidence" Plaintiff "was ultimately unassigned from his CALPIA job due to his medical restrictions." Dkt. 32 at 15. Defendants elaborate on this as follows:

> In September 2018, [Plaintiff] gave Sergeant Lewis, a correctional staff member—not one of the Defendants—the September 2, 2016 permanent limited duty chrono issued by his San Quentin physician that limited his movements due to [Plaintiff]'s back problems. [Beatty Decl. ¶ 8; J. Lewis Decl. ¶ 4.] Upon further examination, correctional staff and CALPIA staff questioned whether [Plaintiff]'s porter assignment might not be appropriate for the chrono's physical limitations. [J. Lewis Decl. ¶ 5; Glass Decl. ¶ 12; McClure Decl. ¶ 6.] These were legitimate questions where [Plaintiff]'s limited duty chrono restricted his activities such that he could not lift or carry more than nineteen pounds, stand for a prolonged period, or stoop, bend, or climb, and yet, he engaged in some of those activities while working as a porter in CALPIA's furniture factory. [K. Lewis Decl., Ex. E at 190:4-191:4; Beatty Decl. ¶ 8; J. Lewis Decl. ¶ 4.]

Dkt. 27 at 19. However, Plaintiff claims that Defendant McClure directed Sergeant Lewis to draft a memorandum "requesting Plaintiff be removed from his assigned job (of seventeen months) using a 'Limited Duty' medical chrono even though the limitations listed did not correspond correctly with any real medical limitations preventing Plaintiff from working at the job he was

assigned." Dkt. 1 at 10-11.  Specifically, Plaintiff claims that his limited duty chrono was "misinterpreted, misapplied, and not implemented based on [his] physician's actual diagnosis and work limitation request."  *Id.* at 11.  The Court finds that such an argument is not sufficient to trigger First Amendment liability for Defendants because it is contradicted by his physician, who did not believe that a porter position was compatible with the physical limitation in that medical classification chrono.  *See* Beatty Decl. ¶ 8.  Specifically, Dr. Beatty stated as follows:

> On September 2, 2016, Mr. Schilling had a follow-up appointment with me concerning lower back pain that he was continuing to suffer.  (Decl. Lewis, Ex. D at DEF 030.)  In light of his continuing back pain, I issued Mr. Schilling a permanent limited duty chrono, Form CDCR-128-C3, that restricted his physical activities to no lifting or carrying more than nineteen pounds, no standing for a prolonged period, and no stooping, bending, or climbing.  (See Decl. Lewis, Ex. C at DEF 010.)  I am informed that when this limited duty chrono was issued, Mr. Schilling was a porter at CALPIA's furniture factory, which entailed cleaning, sweeping, and moving trash in the factory area.  I do not believe that a porter position was compatible with the physical limitations in that medical classification chrono.

*Id.*  As mentioned, on September 20, 2016, Sergeant Lewis drafted a Form CDC-128-G General Chrono regarding the need to reassign Plaintiff to a position that followed the limited duty chrono criteria.  *See* J. Lewis Decl. ¶ 5; Glass Decl. ¶ 12; McClure Decl. ¶ 6.  The record shows that neither Defendant Glass nor Defendant McClure had a role in writing Sergeant Lewis's chrono.  *See* J. Lewis Decl. ¶ 5; Glass Decl. ¶ 12; McClure Decl. ¶ 6.  The record also shows that on September 28, 2016, Plaintiff was unassigned from his CALPIA assignment due to "medical restrictions."  Garcia Decl. ¶ 4; *see also* Dkt. 30-20 at 2.  Thus, Defendants argue as follows:

> Under these facts, it is undisputed that Defendants Glass and McClure did not retaliate against [Plaintiff] for filing an asbestos exposure claim by misusing the limited duty chrono to have him removed from his CALPIA position.  On the contrary, the actions of CALPIA staff and correctional staff to remove a limited duty inmate from a job requiring physical movement reasonably advanced a legitimate correctional goal of ensuring the health and safety of CDCR inmate-workers.

Dkt. 27 at 20.  The Court agrees with Defendants and finds that ensuring Plaintiff's health and safety by prioritizing his limited duty chrono over the physical demands of his CALPIA assignment amounts to a legitimate penological reason supporting his removal from his CALPIA position.  Thus, the Court concludes that there are no issues of material fact concerning Defendant

Glass and McClure's alleged retaliation against Plaintiff. Accordingly, these Defendants are entitled to summary judgment on Plaintiff's First Amendment claim.

## VI.  CONCLUSION

For the foregoing reasons, the Court orders as follows:

1.  Plaintiff's motion for leave to file a sur-reply is DENIED. Dkt. 36.

2.  Plaintiff's motion for recusal is DENIED. Dkt. 31.

3.  Defendants' motion for summary judgment is GRANTED as to all claims,[3] and judgment will be entered in their favor. Dkt. 27.

4.  The Clerk of the Court shall terminate all pending motions and close the file.

5.  This Order terminates Docket Nos. 27, 31, and 36.

IT IS SO ORDERED.

Dated: May 24, 2019

_____
YVONNE GONZALEZ ROGERS
United States District Judge

United States District Court
Northern District of California

---

[3] The Court's finding that Defendants are entitled to summary judgment as a matter of law on Plaintiff's First and Eighth Amendment claims obviates the need to address these Defendants' alternative arguments regarding an entitlement to qualified immunity.